**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MAINE**

In re:

LAO PROPERTIES, LLC,

               Debtor.

Chapter 11

Case No. 11-21571

## DISCLOSURE STATEMENT WITH RESPECT TO PLAN OF REORGANIZATION OF LAO PROPERTIES, LLC, DATED MARCH 2, 2012

LAO Properties, LLC, the above-captioned debtor and debtor in possession (the "Debtor"),[1] presents this Disclosure Statement to all known Holders of Claims against, and interests in and to, the Debtor, in connection with the Debtor's Plan of Reorganization Dated March 2, 2012 (the "Plan").

### I.     Plan Summary

Creditors and interest holders are directed to read this entire Disclosure Statement and should not rely solely on this summary in deciding to vote for the Plan. The following is a short summary of the structure and projected outcome of the Plan.

As will be described more fully below, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code")[2] on November 1, 2011 (the "Petition Date"). On the Petition Date, the Debtor owned and operated the following real property, generally located in York, Maine, as part of its hospitality business: (a) 31 Ocean Avenue Extension ("31 Ocean Avenue"); (b) 67 Ocean Avenue Extension ("67 Ocean Avenue"); (c) 80 Ocean Avenue Extension ("80 Ocean Avenue"); (d) 83 Ocean Avenue Extension ("83

---

[1] Capitalized terms not specifically defined when used initially shall have the meaning ascribed to such terms in § VIII, Article I herein.

[2] Unless otherwise indicated, all statutory citations refer to sections of the Bankruptcy Code.

Ocean Avenue"); (e) 3 Ravine Avenue ("3 Ravine Avenue"); (f) 35 York Street ("35 York Street"); (g) 48 Broadway Street ("48 Broadway"); (h) 9 Kendall Road ("9 Kendall Road"); (i) 26 Brickyard Court, Units 1 and 2 ("Brickyard Court"); (j) 1 Varrell Lane, Unit 19 ("Varrell Lane"); (k) 2 Beach Street, Units 2 and 5 ("Beach Street, Units 2 and 5"); and (l) 2 Beach Street, Unit 3 ("Beach Street, Unit 3," and, together with 31 Ocean Avenue, 67 Ocean Avenue, 80 Ocean Avenue, 83 Ocean Avenue, 3 Ravine Avenue, 35 York Street, 48 Broadway, 9 Kendall Road, Brickyard Court, Varrell Lane, and Beach Street, Unit 3, the "Real Property").[3]

Because the Debtor's hospitality business is primarily seasonal in nature, the Debtor's occupancy levels and associated revenues fluctuate greatly over the course of a calendar year. For instance, during the summer months (i.e., May to September), the occupancy level of the Real Property approaches 100%, but during the winter months (with occupancy increasing around significant holidays and vacation periods), the occupancy level of the Real Property is significantly below 100%. Under the Plan, the Debtor will primarily use the revenue generated by the Real Property to continue to operate the business of the Debtor and to fund the Debtor's obligations under the Plan.

For 2012, the Debtor projects that rental revenues generated by the Real Estate will equal approximately **$560,000.00**, or approximately **$46,000.00** on an average monthly basis. The Debtor also has certain costs and expenses relating to operating the Real Property. On an average monthly basis, the Debtor projects that expenses, including payment of rental commissions to a management company (if required in order to maintain historic occupancy levels), property taxes, and insurance, but excluding payment of the Debtor's obligations in

---

[3] The fair market value of the Real Estate – with the exception of Brickyard Court, Varrell Lane, Beach Street, Units 2 and 5, and Beach Street, Unit 3 – are based on appraisals obtained by the Debtor. The fair market values of Brickyard Court, Varrell Lane, Beach Street, Units 2 and 5, and Beach Street, Unit 3 are based on the Debtor's best estimates as the owner of the properties.

relation to Allowed Secured Claims, will equal approximately **$29,300.00** (assuming no extraordinary repairs or expenses and with costs and expenses being accounted for on an annualized basis).[4]    The Debtor projects that expenses relating to payment of the Allowed Secured Claims under the Plan will equal approximately **$26,900.00** on an average monthly basis.

The projected revenues and expenses are set forth in greater detail on **Exhibit A** attached hereto and incorporated herein by reference.  Many of the expenses set forth on **Exhibit A** are averages based on the actual costs of operations prior to the Petition Date.  Assuming that the projected revenues and expenses are as set forth on **Exhibit A**, this means that the average monthly net revenue (after debt service) will equal approximately **$2,500.00**.    The Debtor anticipates that the monthly net revenue will increase after 2012.  The Debtor intends to use the monthly net revenue to fund the Debtor's obligations under the Plan, including to satisfy Administrative Claims (including Professional Fees and Expenses) and to make payments on Allowed Unsecured Claims.    Generally, the treatment of Claims under the Plan will be as follows:

> **Class One**.  Old School Financial, Inc. ("Old School") asserts a first priority mortgage on 31 Ocean Avenue.  Old School filed a motion for relief from stay against the Debtor shortly after the case was filed.  The Debtor filed an opposition to the motion.  Over the course of these proceedings, the Debtor and Old School reached an agreement which restructured the obligations between the parties.    The terms of the agreement were approved by the Bankruptcy Court pursuant to the terms of that certain Order Granting Old School Financial Inc.'s Motion for Relief from Stay dated January 27, 2012 (the "Old School Order").  The Secured Claim of Old School will be paid under the Plan in accordance with the terms of the Old School Order.

---

[4] This expense amount may vary depending on whether Claimants are ultimately determined to hold Allowed Claims against the Debtor.  The Debtor reserves the right to object to the amounts of any and all Claims asserted against the Debtor in the manner provided for in the Plan.  These numbers also assume that the Claims are treated in the manner provided for in the Plan.

**Class Two**.  The Bank of New York Mellon, f/k/a The Bank of New York, as trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates 2006-FA6 30 Yr (the "2006 BONY Trust"), asserts a first priority mortgage on 67 Ocean Avenue, which secures a Claim against the Debtor in the amount of **$974,953.99**.  The fair market value of 67 Ocean Avenue is **$915,000.00**, and thus the 2006 BONY Trust may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of the Town of York ("York"), relating to property taxes owed on the property, and the York Sewer District (the "Sewer District"), relating to sewer liens owed on the property.[5]  Under the Plan, in the event it is determined that the 2006 BONY Trust holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Three**.  Powder Mill Road Property Management, LLC ("Powder Mill") asserts a first priority mortgage on 80 Ocean Avenue.  Powder Mill filed a motion for relief from stay against the Debtor shortly after the case was filed.  The Debtor filed an opposition to the motion.  Over the course of these proceedings, the Debtor and Powder Mill reached an agreement which restructured the obligations between the parties.  The terms of the agreement were approved by the Bankruptcy Court pursuant to the terms of that certain Order Granting Powder Mill Road Property Management, LLC's Motion for Relief from Stay dated January 27, 2012 (the "Powder Mill Order").  The Secured Claim of Powder Mill will be paid under the Plan in accordance with the terms of the Powder Mill Order.

**Class Four**.  The Bank of New York Mellon, f/k/a The Bank of New York, as trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates FHAMS 2005-FA10 (the "2005 BONY Trust"), asserts a first priority mortgage on 83 Ocean Avenue, which secures a Claim against the Debtor in the amount of **$911,978.94**.  The fair market value of 83 Ocean is **$736,000.00**, and thus the 2005 BONY Trust may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of York, relating to property taxes owed on the property, and the Sewer District, for sewer liens owed on the property.[6]  Under the Plan, in the event it is determined that the 2005 BONY Trust holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Five**.  One West Bank, FSB ("One West") asserts a first priority mortgage on 3 Ravine Avenue, which secures a Claim against the Debtor in the amount of **$426,764.11**.  The fair market value of 3 Ravine Avenue is **$363,000.00**, and thus One West may have a Secured Claim in the amount of the value of the property, less any Allowed Secured

---

[5] The 2006 BONY Trust disputes the fair market value of 67 Ocean Avenue, and believes that the value may be greater than $915,000.00.  The Debtor and the 2006 BONY Trust both reserve all their rights regarding the fair market value of 67 Ocean Avenue.

[6] The 2005 BONY Trust disputes the fair market value of 83 Ocean Avenue, and believes that the value may be greater than $736,000.00.  The Debtor and the 2005 BONY Trust both reserve all their rights regarding the fair market value of 83 Ocean Avenue.

Claims of York, relating to property taxes owed on the property, and the Sewer District, for sewer liens owed on the property.  Under the Plan, in the event it is determined that One West holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Six**.    Provident Funding Associates, LP ("<u>Provident</u>") asserts a first priority mortgage on 48 Broadway, which secures a Claim against the Debtor in the amount of **$353,732.26**.  The fair market value of 48 Broadway is **$293,000.00**, and thus Provident may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of York, relating to property taxes owed on the property, and the Sewer District, for sewer liens owed on the property.[7]  Under the Plan, in the event it is determined that Provident holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Seven**.    TD Bank, N.A. ("<u>TD Bank</u>") asserts a first priority mortgage on 35 York Street, which secures a Claim against the Debtor in the approximate amount of **$150,000.00**.  The fair market value of 35 York Street is **$487,000.00**, and thus TD Bank may have a Secured Claim in the approximate amount of **$150,000.00**, subordinate only to any Allowed Secured Claims of York, relating to property taxes owed on the property, and the Sewer District, relating to sewer liens owed on the property.  Under the Plan, in the event it is determined that TD Bank holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Eight**.    The Bank of New York Mellon, f/k/a The Bank of New York, as trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates FHAMS 2007-AA3 (the "<u>2007 BONY Trust</u>"), asserts a first priority mortgage on 9 Kendall Road, which secures a Claim against the Debtor in the amount of **$640,429.04**. The fair market value of 9 Kendall Road is **$438,000.00**, and thus the 2007 BONY Trust may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of York, relating to property taxes owed on the property, and the Sewer District, for sewer liens owed on the property.[8]  Under the Plan, in the event it is determined that the 2007 BONY Trust holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of three and four-tenths percent (3.4%, an interest rate that equals the

---

[7] Provident disputes the fair market value of 48 Broadway, and believes that the value may be $375,000.00.  The Debtor and Provident both reserve all their rights regarding the fair market value of 48 Broadway.

[8] The 2007 BONY Trust disputes the fair market value of 9 Kendall Road, and believes that the value may be greater than $483, 000.00.  The Debtor and the 2007 BONY Trust both reserve all their rights regarding the fair market value of 9 Kendall Road.

contract rate as of the date of the filing of this Disclosure Statement) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Nine**.  Optima Bank & Trust Co. ("Optima") asserts first priority mortgages on Beach Street, Units 2 and 5, and Beach Street, Unit 3, which secures Claims against the Debtor in the amount of **$283,433.00**.  The fair market value of Beach Street, Units 2 and 5 is **$160,000.00,** and the fair market value of Beach Street, Unit 3 is **$80,000.00**, and thus Optima Secured Claims in the amount of the values of the properties, less any Allowed Secured Claims of York, relating to property taxes owed on the properties, the Sewer District, for sewer liens owed on the properties, and Destefano, which asserts mechanics' liens on the properties.  Under the Plan, in the event it is determined that Optima holds Allowed Secured Claims against the Debtor, monthly payments on the Allowed Secured Claims will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Ten**.  DDP Florida Investments, LLC ("DDP") asserts second priority mortgages on 31 Ocean Avenue, 67 Ocean Avenue, and 9 Kendall Road, which secure a Claim against the Debtor in the approximate amount of **$1,000,000.00**.  These properties have the following fair market values: 31 Ocean Avenue - **$653,000.00**; 67 Ocean Avenue - **$915,000.00**; and 9 Kendall Road - **$438,000.00**.  DDP may have a Secured Claim in the amount of the values of these properties, less any Allowed Secured Claims of York, relating to property taxes owed on the properties, the Sewer District, relating to sewer liens owed on the properties, Old School, which purports to hold a first position mortgage on 31 Ocean Avenue, the 2006 BONY Trust, which purports to hold a first priority mortgage on 67 Ocean Avenue, and the 2007 BONY Trust, which purports to hold a first priority mortgage on the 9 Kendall Road.  Under the Plan, in the event it is determined that DDP holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of five percent (5%) and amortized over thirty (30) years with a balloon payment in ten (10) years.

**Class Eleven**.  First Horizon Home Loan Corp. ("First Horizon") asserts a second priority mortgage on 83 Ocean Avenue, which secures a Claim against the Debtor in the approximate amount of **$250,000.00**.  The fair market value of 83 Ocean Avenue is **$736,000.00**, and thus First Horizon may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of York, relating to property taxes owed on the property, the Sewer District, relating to sewer liens owed on the property, and the 2005 BONY Trust, which purports to hold a first priority mortgage on 83 Ocean Avenue.  Under the Plan, in the event it is determined that First Horizon Trust holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of five percent (5%) and amortized over thirty (30) years with a balloon payment in ten (10) years.

**Class Twelve**.  The Mortgage Electronic Registration Systems, acting solely as nominee for Nation One Mortgage Company, Inc. ("MERS-Nation One") asserts a second priority mortgage on 3 Ravine Avenue, which secures a Claim against the Debtor in the

approximate amount of **$121,000.00**.   The fair market value of 3 Ravine Avenue is **$363,000.00**, and thus MERS-Nation One may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of York, relating to property taxes owed on the property, the Sewer District, relating to sewer liens owed on the property, and One West, which purports hold to a first priority mortgage on the property. Under the Plan, in the event it is determined that MERS-Nation One holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of five percent (5%) and amortized over thirty (30) years with a balloon payment in ten (10) years.

**Class Thirteen**.   Bangor Savings Bank ("BSB") asserts junior judgment liens on 31 Ocean Avenue, 67 Ocean Avenue, 80 Ocean Avenue, 83 Ocean Avenue, 3Ravine Avenue, 35 York Street, 48 Broadway, and Beach Street, Unit 3, which secure a Claim against the Debtor in the amount of **$45,145.72**.   These properties have the following fair market values: 31 Ocean Avenue - **$653,000.00**; 67 Ocean Avenue - **$915,000.00**; 80 Ocean Avenue - **$963,000.00**; 83 Ocean Avenue - **$736,000**; 3 Ravine Avenue - **$363,000.00**; 35 York Street - **$487,000.00**; 48 Broadway - **$293,000.00**; and Beach Street, Unit 3 - **$80,000.00**.   BSB may have a Secured Claim in the amount of the values of the properties, less any Allowed Secured Claims of York, relating to property taxes owed on the properties, the Sewer District, relating to sewer liens owed on the properties, Old School, which purports to hold a first priority mortgage on 31 Ocean Avenue, the 2006 BONY Trust, which purports to hold a first priority mortgage on 67 Ocean Avenue, Powder Mill, which purports to hold a first priority mortgage on 80 Ocean Avenue, the 2005 BONY Trust, which purports to hold a first priority mortgage on 83 Ocean Avenue, Destefano, which asserts mechanics' liens on Beach Street, Unit 3, Optima, which purports to hold a first priority mortgage on Beach Street, Unit 3, One West, which purports to hold a first priority mortgage on 3 Ravine Avenue, TD Bank, which purports to hold a first priority mortgage on 35 York Street,  Provident, which purports to hold a first priority mortgage on 48 Broadway, MERS-Nation One, which purports to hold a first priority mortgage on 3 Ravine Avenue, First Horizon, which purports to hold a second priority mortgage on 83 Ocean Avenue, and Nuzzo, who purports to hold a third priority mortgage on 83 Ocean Avenue.   Under the Plan, in the event it is determined that BSB holds Allowed Secured Claims against the Debtor, monthly payments on the Allowed Secured Claims will be paid based on an interest rate of five percent (5%) and amortized over thirty (30) years with a balloon payment in ten (10) years.

**Class Fourteen**.   Deutsche Bank National Trust Company, as Indenture Trustee of the American Home Mortgage Investment Trust 2005-2 (the "Deutsche Trust"), asserts a second priority mortgage on 35 York Street, which secures a Claim against the Debtor in the approximate amount of **$461,360.74**.   The fair market value of 35 York Street is **$487,000.00**, and thus the Deutsche Trust may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of York, relating to property taxes owed on the property, the Sewer District, relating to sewer liens owed on the property, and TD Bank, which purports to hold a first priority mortgage on the property. Under the Plan, in the event it is determined that the Deutsche Trust holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will

be paid based on an interest rate of five percent (5%) and amortized over thirty (30) years with a balloon payment in ten (10) years.

**Class Fifteen**.  The Bank of Maine, f/k/a Savings Bank of Maine ("BOM"), asserts junior judgment liens on 31 Ocean Avenue, 67 Ocean Avenue, 80 Ocean Avenue, 83 Ocean Avenue, 3 Ravine Avenue, 35 York Street, 48 Broadway, and Beach Street, Unit 3, which secure a Claim against the Debtor in the amount of **$45,145.72**.  These properties have the following fair market values: 31 Ocean Avenue - **$653,000.00**; 67 Ocean Avenue - **$915,000.00**; 80 Ocean Avenue - **$963,000.00**; 83 Ocean Avenue - **$736,000.00**; 3 Ravine Avenue - **$363,000.00**; 35 York Street - **$487,000.00**; 48 Broadway - **$293,000.00**; and Beach Street, Unit 3 - **$80,000.00**.  BOM may have a Secured Claim in the amount of the values of the properties, less any Allowed Secured Claims of York, relating to property taxes owed on the properties, the Sewer District, relating to sewer liens owed on the properties, Old School, which purports to hold a first priority mortgage on 31 Ocean Avenue, the 2006 BONY Trust, which purports to hold a first priority mortgage on 67 Ocean Avenue, Powder Mill, which purports to hold a first priority mortgage on 80 Ocean Avenue, the 2005 BONY Trust, which purports to hold a first priority mortgage on 83 Ocean Avenue, Destefano, which asserts mechanics' liens on Beach Street, Unit 3, Optima, which purports to hold a first priority mortgage on Beach Street, Unit 3, One West, which purports to hold a first priority mortgage on 3 Ravine Avenue, TD Bank, which purports to hold a first priority mortgage on 35 York Street, , Provident, which purports to hold a first priority mortgage on 48 Broadway, MERS-Nation One, which purports to hold a first priority mortgage on 3 Ravine Avenue, First Horizon, which purports to hold a second priority mortgage on 83 Ocean Avenue, Nuzzo, who purports to hold a third priority mortgage on 83 Ocean Avenue, and BSB, which purports to hold judgment liens on 31 Ocean Avenue, 67 Ocean Avenue, 80 Ocean Avenue, 83 Ocean Avenue, 3 Ravine Avenue, 35 York Street, 48 Broadway, and Beach Street, Unit 3.  Under the Plan, in the event it is determined that BOM holds Allowed Secured Claims against the Debtor, monthly payments on the Allowed Secured Claims will be paid based on an interest rate of five percent (5%) and amortized over thirty (30) years with a balloon payment in ten (10) years.

**Class Sixteen**.  Steve Nuzzo ("Nuzzo") asserts a third priority mortgage on 83 Ocean Avenue, which secures a Claim against the Debtor in the approximate amount of **$200,000.00**.  The fair market value of 83 Ocean Avenue is **$736,000.00**, and thus Nuzzo may have a Secured Claim in the amount of the value of the property, less any Allowed Secured Claims of York, relating to property taxes owed on the property, the Sewer District, relating to sewer liens owed on the property, the 2005 BONY Trust, which purports to hold a first priority mortgage on the property, and First Horizon, which purports to hold a second priority mortgage on the property.  Under the Plan, in the event it is determined that Nuzzo holds an Allowed Secured Claim against the Debtor, monthly payments on the Allowed Secured Claim will be paid based on an interest rate of five percent (5%) and amortized over thirty (30) years with a balloon payment in ten (10) years.

**Class Seventeen**.  Destefano & Associates, Inc. ("Destefano") asserts mechanics' liens on Beach Street, Units 2 and 5, and Beach Street, Unit 3, which secures a Claim against the Debtor in the amount of **$668,930.37**.  The fair market value of Beach Street, Units 2 and 5, is **$160,000.00**, and the fair market value of Beach Street, Unit 3 is **$80,000.00**, and thus, to the extent that Destefano's asserted mechanics' liens prime the interests of Optima, which purports to hold first priority mortgages on the properties, under Maine law, Destefano may have a Secured Claim in the amount of the value of the properties, less any Allowed Secured Claims of York, for property taxes owed on the properties, and the Sewer District, for sewer liens owed on the properties.  Under the Plan, in the event it is determined that Destefano holds Allowed Secured Claims against the Debtor, monthly payments on the Allowed Secured Claims will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over forty (40) years with a balloon payment in ten (10) years.

**Class Eighteen**.  The Sewer District asserts priority statutory liens on 31 Ocean Avenue, 67 Ocean Avenue, 80 Ocean Avenue, 83 Ocean Avenue, 3 Ravine Avenue, 35 York Street, 48 Broadway, and 9 Kendall Road, which secure Claims against the Debtor in the amount of **$5,727.66**.  These properties have the following fair market values: 31 Ocean Avenue - **$653,000.00**; 67 Ocean Avenue - **$915,000.00**; 80 Ocean Avenue - **$963,000.00**; 83 Ocean Avenue – $736,000.00; 3 Ravine Avenue - **$363,000.00**; 35 York Street - **$487,000.00**;  48 Broadway - **$293,000.00**; and 9 Kendall Road - **$438,000.00**. The Sewer District may have Secured Claims in the amount of $5,727.66, subordinate only to any Allowed Secured Claims of York, relating to property taxes owed on the properties.  Under the Plan, in the event it is determined that the Sewer District holds Allowed Secured Claims against the Debtor, monthly payments on the Allowed Secured Claims will be paid based on an interest rate of four and one-quarter percent (4.25%) and amortized over five (5) years.  The Sewer District shall return any security deposits made by the Debtor pursuant to § 366 on the Confirmation Date.

**Class Nineteen**.   York asserts priority statutory liens arising out of property tax obligations on 31 Ocean Avenue, 67 Ocean Avenue, 80 Ocean Avenue, 83 Ocean Avenue, Beach Street, Units 2 and 5, Beach Street, Unit 3, 3 Ravine Avenue, 48 Broadway, and 9 Kendall Road, which secure Claims against the Debtor in the amount of **$67,440.24**.  These properties have the following fair market values: 31 Ocean Avenue - **$653,000.00**; 67 Ocean Avenue - **$915,000.00**; 80 Ocean Avenue - **$963,000.00**; 83 Ocean Avenue - **$736,000.00**; 3 Ravine Avenue - **$363,000.00**; 48 Broadway - **$293,000.00**; and Beach Street, Units 2 and 5 - **$160,000.00**; and Beach Street, Unit 3 - **$80,000.00**.   York may have Secured Claims in the amount of **$67,440.24**.   Under the Plan, in the event it is determined that York holds Allowed Secured Claims against the Debtor, monthly payments on the Allowed Secured Claims will be paid based on an interest rate of seven percent (7%, pursuant to 36 M.R.S. § 505) and amortized over five (5) years, with the final monthly payment made on the fifth (5th) anniversary of the Petition Date, in accordance with § 1129(a)(9)(D).

**Class Twenty**.  Class Twenty consists of the Allowed Unsecured Claims against the Debtor.  The total amount of known Unsecured Claims equals **$562,880.92** (excluding

any Unsecured Claims resulting from the bifurcation of Claims under § 506). In full and final satisfaction of Class Twenty Claims, the Debtor will make annual payments on a <u>Pro Rata</u> basis to the Claimants holding Allowed Unsecured Claims of the annual net operating revenue **after** satisfaction of Unclassified Claims, payment of ordinary operating expenses, payment of extraordinary repairs and maintenance, payment of other items identified in the Plan and after accounting for an operating reserve that will allow payments under the Plan from the date of each annual payment to Unsecured Claimants through the June 1 of each year, for a period of seven (7) years.

**Class Twenty-One**. Lorri O'Brien, Paul O'Brien, and AKR Management, LLC ("<u>AKR</u>"), the members of the Debtor, shall retain their equity interests in the Debtor, but there shall be no distributions with respect to such interests until the Allowed Claims in Class Twenty are paid in full as provided for under the Plan, and provided the Debtor is not in default of its obligations to Claimants in Classes One through Twenty.

In the event the Debtor sells or refinances all of the Real Property, the proceeds from such sale or refinancing (after accounting for the costs and expenses associated with the sale) shall be distributed in accordance with the treatment of Claims under the Plan in full and final satisfaction of the Debtor's obligations under the Plan. In the event the Debtor sells or refinances less than all of the Real Property, the proceeds (after accounting for the costs and expenses associated with the sale) shall first be used to satisfy the Allowed Secured Claims secured by that specific property which is the subject of the sale or refinancing. The remaining proceeds, if any, shall be used to fund Unclassified Claims first then Allowed Claims in Class Twenty, with the remaining amounts, if any, being distributed to Claimants in Class Twenty-One.

Pursuant to the Plan, the Debtor shall be discharged from all of its pre-petition obligations, but the Debtor shall not be discharged of its obligation to make payments under the Plan. The Debtor believes that the Plan provides for the fair and equitable treatment of all creditor claims and that the Plan is in the best interests of all creditors and other parties in interest.

10

## II.        Introduction

The purpose of this Disclosure Statement is to provide such information as may be deemed material, important and necessary for the Debtor's creditors and holders of interests to make an informed decision in exercising their right to vote, if any, to accept or reject the Plan. This Disclosure Statement will also assist the Bankruptcy Court in its determination whether the Plan complies with all applicable provisions of the Bankruptcy Code and should, therefore, be confirmed.  All exhibits to this Disclosure Statement, as well as the Plan, are incorporated into and made a part of this Disclosure Statement.

**IT IS RECOMMENDED THAT EACH CREDITOR AND HOLDER OF AN INTEREST REVIEW THE ENTIRE PLAN AND DISCLOSURE STATEMENT CAREFULLY AND DETERMINE WHETHER OR NOT TO ACCEPT THE PLAN BASED ON THAT CREDITOR'S OR INTEREST HOLDER'S INDEPENDENT EVALUATION AND JUDGMENT.  IT IS IMPORTANT THAT YOU VOTE IF YOU HAVE A RIGHT TO VOTE.   IN DETERMINING WHETHER A PLAN OF REORGANIZATION HAS BEEN ACCEPTED BY THE REQUIRED MAJORITIES OF CREDITORS AND INTEREST HOLDERS, ONLY THOSE CREDITORS AND INTEREST HOLDERS WHO ACTUALLY VOTE ON THE PLAN ARE COUNTED, EXCEPT WHERE SPECIFICALLY STATED OTHERWISE**.

**NO REPRESENTATIONS CONCERNING THE PLAN ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.   THE PORTIONS OF THIS DISCLOSURE STATEMENT DESCRIBING THE DEBTOR, THE PLAN, AND THE PRE- AND POST-BANKRUPTCY OPERATIONS OF THE DEBTOR, HAVE BEEN PREPARED FROM INFORMATION SUBMITTED BY**

**REPRESENTATIVES OF THE DEBTOR. THE DEBTOR BELIEVES THIS INFORMATION TO BE ACCURATE AND COMPLETE BUT MAKES NO WARRANTIES AS TO SUCH COMPLETENESS OR ACCURACY. NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.**

### III.     Description of the Debtor

The Debtor is a limited liability company organized and existing under the laws of the State of Maine. Lorri O'Brien owns 84.06% of the Debtor's membership interests, and AKR and Paul O'Brien own the remainder. On the Petition Date, the Debtor owned and operated the Real Property as part of its hospitality business.

### IV.     Events Leading to the Chapter 11 Case

Immediately prior to the Petition Date, and prior to the revocation of certain trusts, the Real Property was owned by the following previous owners (collectively, the "Previous Owners"):

| Property | Previous Owner(s) |
| --- | --- |
| 31 Ocean Avenue Extension, York, ME | Bernhard Realty Trust |
| 67 Ocean Avenue Extension, York, ME | RBS Trust |
| 80 Ocean Avenue Extension, York, ME | Dutch Trust |
| 83 Ocean Avenue Extension, York, ME | Cahill Trust |

| | |
|---|---|
| 3 Ravine Avenue, York, ME | Ravine Trust |
| 35 York Street, York, ME | York Street Trust |
| 26 Brickyard Court, Unit 1, York, ME | Brickyard Court Trust |
| 26 Brickyard Court, Unit 2, York, ME | Brickyard Court Trust |
| 48 Broadway, York, ME | Bowden Trust |
| 9 Kendall Road, York, ME | Paul O'Brien |
| 2 Beach Street, Unit 2, York, ME | AKR Management, LLC |
| 2 Beach Street, Unit 3, York, ME | RBS II Trust |
| 2 Beach Street, Unit 5, York, ME | AKR Management, LLC |
| 1 Varrell Lane, Unit 19, York, ME | Lorri O'Brien |

Each of the trusts (collectively, the "Trusts") were self-settled, revocable, real estate trusts established under the laws of the State of Maine by Lorri O'Brien. Each Trust was created pursuant to a declaration of trust that stated that Lorri O'Brien could revoke the trust in writing at any time, and that by such revocation, ownership of the Trust property would revert to Lorri O'Brien individually.

Lorri O'Brien operated the Real Property as part of a real estate enterprise (the "Enterprise"). Prior to the Petition Date, Rivers by the Sea ("RBS") acted as the property manager and rental agent for this Enterprise, and the Enterprise historically generated nearly $1 million per year in gross rental income. Prior to 2009, the Enterprise consistently serviced its debt, paid its operating expenses, and generated a profit. Beginning in 2009, however, the Enterprise began to experience declining revenues as the worldwide economic recession impacted the hospitality industry. Between 2009 and the Petition Date, the Debtor experienced a decline in revenues of approximately forty percent (40%). As a result of this decline in revenue,

13

the Enterprise was unable to service its debt, and various lenders filed foreclosure actions in Maine state court against the Real Property.

In 2011, after failed attempts to reorganize the Enterprise's finances through out-of-court negotiations with various lenders, Lorri O'Brien decided to reorganize the Enterprise through the bankruptcy process. On or about October 27, 2011, Lorri O'Brien exercised her right to revoke the Trusts in the manner described in the trust declarations. Upon revocation, the ownership of the Trusts' real estate reverted to Lorri O'Brien individually. On or about the same date, Lorri O'Brien, Paul O'Brien, and AKR (a limited liability company controlled by Lorri O'Brien and one other member) formed the Debtor and transferred the Real Property to the Debtor in exchange for: (1) membership interests in the Debtor (described in more detail in § III above); (2) the Debtor assuming all liabilities related to the Real Property; and (3) the Debtor's promise to indemnify and hold Lorri O'Brien, Paul O'Brien, and AKR harmless in the event these parties were held liable for certain obligations owed to lenders and others.

In order to prevent certain lenders from completing foreclosure sales on certain parcels of the Real Property which were scheduled for November 1, 2011, on November 1, 2011, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. With the approval of the Bankruptcy Court, the Debtor retained Bernstein, Shur, Sawyer & Nelson, P.A. ("Bernstein Shur") as its bankruptcy counsel to assist the Debtor in the prosecution of the case and the formulation of the Plan. The Debtor, with Bankruptcy Court approval, also retained Steve Cole, C.P.A. and Strategic Concepts (together, "SC") as its accountant to assist in financial matters relating to the chapter 11 case.

**V.      Assets and Liabilities on the Petition Date**[9]

On the Petition Date, the Debtor owned the Real Property, more specifically identified in § III above, which it operated as part of its hospitality business.  On the Petition Date, the Real Property had a tax assessed value of $7,067,100.00.  The Real Property was encumbered by certain mortgages and liens totaling $10,348,086.81.

On the Petition Date, the Debtor owned certain personal property with an aggregate value of $574,829.60, and owed Unsecured Claims totaling $562,880.92.  The Debtor's most valuable personal property, and its most significant unsecured liability, arose out of the Debtor's relationship with its management company, RBS.  As described in § IV above, the Previous Owners employed RBS to act as a property manager and rental agent with respect to the Real Property.  When the Previous Owners were unable to pay for services performed, and commissions earned, by RBS, RBS began to withhold rental payments generated by the Real Property.  As a result of these transactions, as of the Petition Date, RBS owed the Debtor $367,312.60 (listed as an account receivable on the Debtor's schedule of assets), and the Debtor owed RBS $524,878.03 (listed as an unsecured debt on the Debtor's schedule of liabilities). RBS claims that it is entitled to set off the account receivable against the account payable under § 553 and state law; if RBS is, in fact, entitled to set off, the Debtor may owe RBS approximately $150,000.00, which will reduce both the Debtor's personal property assets and unsecured liabilities.

---

[9]  This section provides only a very general overview of the assets and liabilities of the Debtor as of the Petition Date.  For a more complete description, please refer to the Schedules and Statement of Financial Affairs filed by the Debtor.

## VI.     <u>Significant Post-Petition Events</u>

Since the Petition Date, the Debtor has continued operating the Real Property in accordance with the requirements of the Bankruptcy Code.  Significantly, the Debtor initially restructured its relationship with its rental and management agent, RBS, so that the intercompany accounting issues (described in § V above) would not continue after the Petition Date.  Although the Debtor and RBS continued their management relationship during the early parts of the chapter 11 case, the Debtor recently terminated the management agreement with RBS for a variety of reasons and is currently managing the Real Properties on its own.

The Debtor has also begun the process of restructuring its debt even prior to filing this Disclosure Statement.  First, on the Petition Date, D.D.P., LLC purported to hold a first priority mortgage on Varrell Lane.  Through investigation and negotiation, D.D.P., LLC has waived this mortgage and its claims against the Debtor at no cost to the Debtor.  Second, prior to the Petition Date, Varrell Lane and Brickyard Court were incurring more liabilities than they generated in rental income.  After negotiations, the Debtor agreed to acquiesce in Mirabito's request for relief from the automatic stay so that she can foreclose on the properties in state court.  In exchange, Mirabito has waived all her claims against the Debtor.  Third, the Debtor has been able to restructure its obligations to Old School and Powder Mill in the manner described above.

## VII.     <u>Current Assets and Liabilities of the Debtor</u>

The Claims against the Debtor and the assets of the Debtor as of the approximate date of the filing of this Disclosure Statement are estimated to be as follows:

**ASSETS:**

**The Real Property**

| | |
|---|---|
| **31 Ocean Avenue** | **$653,000.00** |
| **67 Ocean Avenue** | **$915,000.00** |

16

| | |
|---|---|
| **80 Ocean Avenue** | **$963,000.00** |
| **83 Ocean Avenue** | **$736,000.00** |
| **3 Ravine Avenue** | **$363,000.00** |
| **35 York Street** | **$487,000.00** |
| | |
| **48 Broadway** | **$293,000.00** |
| **9 Kendall Road** | **$438,000.00** |
| **Beach Street, Units 2 and 5** | **$160,000.00** |
| **Beach Street, Unit 3** | **$80,000.00** |
| | |
| **Furnishings at the Real Property** | **$200,000.00** |
| **Accounts Receivable from RBS** | **$367,312.60** |
| **Operating Account** | **$15,485.00** |
| **Tenant Deposit Account** | **$25.00** |
| | |
| **TOTAL ASSETS:** | **$5,683,922.60** |

**LIABILITIES:**[10]

**Creditors Holding Secured Claims (all approximate amounts as of the Petition Date, and not accounting for the bifurcation of claims):**

| | |
|---|---|
| **Old School** | **$890,543.83** |
| **DDP** | **$1,000,000.00** |
| **2005 BONY Trust** | **$911,978.94** |
| **2006 BONY Trust** | **$974,953.99** |
| **2007 BONY Trust** | **$640,429.04** |
| **Deutsche Trust** | **$461,360.74** |
| **Powder Mill** | **$1,557,728.34** |
| **First Horizon** | **$250,000.00** |
| **One West** | **$426,764.11** |
| **MERS-Nation One** | **$121,000.00** |
| **Provident** | **$353,732.26** |
| **TD Bank** | **$150,000.00** |
| | |
| **Optima** | **$283,433.00** |
| **Lancaster** | **$2,001.37** |
| **Nuzzo** | **$200,000.00** |
| **York** | **$12,620.22** |
| **Sewer District** | **$5,727.66** |
| **BSB** | **$45,145.72** |
| **BOM** | **$512,737.22** |

---

[10] The Debtor reserves the right to contest all of the Claim amounts set forth herein. The Claim amounts were taken from proofs of Claim filed by the Claimants, papers filed by the Claimants with the Bankruptcy Court or another court, or taken from amounts estimated by the Debtor.

| | |
|---|---|
| **Destefano** | **$668,930.37** |

**Creditors Holding Unsecured Priority Claims:**

| | |
|---|---|
| **Bernstein Shur (projected attorneys fees)** | **$75,000.00** |
| **SC (projected accounting fees)** | **$2,500.00** |

**Creditors holding Unsecured Non-priority Claims (amounts taken from proofs of Claim or from communications with Claimant and the amounts do not include the results of Claim bifurcation which may be warranted):**

| | |
|---|---|
| **AK Condominium Association** | **$546.00** |
| **AKR** | **$542.43** |
| **Bragdon Commons Condo. Assoc.** | **$20,956.00** |
| **Central Maine Power** | **$818.34** |
| **D.F. Richard Energy** | **$919.71** |
| **FairPoint Communications** | **$21.80** |
| **Holyoke Mutual Insurance** | **$1,872.00** |
| **Lancaster** | **$2,682.72** |
| **RBS** | **$524,878.03** |
| **Middlesex Assurance Co.** | **$4,788.64** |
| **Perkins Propane** | **$115.46** |
| **Premium Financing Specialists** | **$263.71** |
| **Proulx Oil & Propane** | **$241.83** |
| **Time Warner Cable of Maine** | **$1,049.48** |
| **Union Mutual of Vermont** | **$935.25** |
| **York Water District** | **$1,899.52** |

| | |
|---|---|
| **TOTAL LIABILITIES:** | **$10,163,937.31** |

## VIII.   Plan of Reorganization

### ARTICLE I
### Definitions

The following terms, when used in the Plan, shall, unless the context otherwise requires,

have the following respective meanings:

"2005 BONY Trust" shall mean The Bank of New York Mellon, f/k/a The Bank of New York, as trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates FHAMS 2005-FA10, and its predecessors and successors in interest.

18

"2006 BONY Trust" shall mean The Bank of New York Mellon, f/k/a The Bank of New York, as trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates 2006-FA6 30 Yr, and its predecessors and successors in interest.

"2007 BONY Trust" shall mean The Bank of New York Mellon, f/k/a The Bank of New York, as trustee for the holders of the Certificates, First Horizon Mortgage Pass-Through Certificates FHAMS 2007-AA3, and its predecessors and successors in interest.

"3 Ravine Avenue" shall mean the real property owned by the Debtor and generally located at 3 Ravine Avenue in York, Maine.

"31 Ocean Avenue" shall mean the real property owned by the Debtor and generally located at 31 Ocean Avenue Extension in York, Maine.

"35 York Street" shall mean the real property owned by the Debtor and generally located at 35 York Street in York, Maine.

"48 Broadway" shall mean the real property owned by the Debtor and generally located at 48 Broadway in York, Maine.

"67 Ocean Avenue" shall mean the real property owned by the Debtor and generally located at 67 Ocean Avenue Extension in York, Maine.

"80 Ocean Avenue" shall mean the real property owned by the Debtor and generally located at 80 Ocean Avenue Extension in York, Maine.

"83 Ocean Avenue" shall mean the real property owned by the Debtor and generally located at 83 Ocean Avenue Extension in York, Maine.

"9 Kendall Road" shall mean the real property owned by the Debtor and generally located at 9 Kendall Road in York, Maine.

"Administrative Claim" shall mean an expense of the kind described in § 503(b).

"AKR" shall mean AKR Management, LLC.

"Allowed" shall mean, with respect to any Claim, the status of the Claim, such that: (a) upon expiration of the Claims Objection Date, the Claim, whether filed or scheduled, has not been disputed; or (b) with respect to Disputed Claims, a Final Order allowing the Claim has been entered.

"Allowed Amount" of a Claim shall mean, for the purposes of the Plan, (a) the amount of the Claim scheduled by the Debtor if (i) the Claim is not scheduled as disputed, contingent or unliquidated by the Debtor, (ii) no objection to that amount is filed by the Claims Objection Date, and (iii) the Holder of the Claim has not timely filed a properly prepared proof of Claim in an amount different than that scheduled by the Debtor; (b) the

amount set forth by the Holder of a Claim in a timely filed and properly prepared proof of Claim if that amount differs from the amount scheduled by the Debtor and no objection to the amount stated in the proof of Claim is filed by the Claims Objection Date; or (c) the amount of such Claim established by a Final Order of the Bankruptcy Court if (i) such Claim is scheduled by the Debtor as contingent or disputed, (ii) an objection to that amount is filed on or before the Claims Objection Date, or (iii) if the amount set forth by the Holder of such Claim in a timely filed, properly prepared proof of Claim differs from the amount scheduled by the Debtor and an objection is filed to the proof of Claim on or before the Claims Objection Date.

"Allowed Secured Claim" shall mean an Allowed Claim arising on or before the Petition Date that is secured by a valid Lien on property of the Debtor which is not void or avoidable under any state or federal law, including any provision of the Bankruptcy Code.

"Annual Net Operating Revenue" shall mean (a) the gross proceeds generated by the Real Property for the applicable year; **plus** (b) any and all amounts collected by the Debtor in relation to any Post-Confirmation Causes of Action; **minus** the following:

    a.        Amounts paid to satisfy Unclassified Claims under this Plan (see Article III);

    b.        Amounts paid in accordance with this Plan to satisfy the Claims in Classes One through Nineteen of this Plan;

    c.        Amounts needed to fund ordinary and necessary expenses of operating the Real Property, including in the categories identified in the cash plan (the "Cash Plan") attached to the Plan as **Exhibit A** (with the recognition that the amounts set forth on the Cash Plan may require adjustment over time) and amounts needed for an operating reserve that will allow payments under the Plan from the date of the payment to Unsecured Claimants through the June 1 of each year; and

    d.        Extraordinary expenses for repair and maintenance of the Real Property.

"Assets" shall mean all property that would be property of the Debtor and the Debtor's estate under § 541, whether such property is now existing or hereafter arising or acquired and wherever located including, without limitation, all Post-Confirmation Causes of Action and all proceeds and recoveries on Post-Confirmation Causes of Action, all accounts, contract rights, chattel paper, general intangibles, instruments, securities, furniture, fixtures, machinery, equipment, inventory, intellectual property, domain names, and interest in real estate.

"Bankruptcy Code" shall mean title 11 of the United States Code, as in effect with respect to the Case on the Petition Date. All Bankruptcy Code references herein are to the Bankruptcy Code in effect as of the Petition Date, unless otherwise stated.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Maine.

"Bar Date" shall mean the date established by the Bankruptcy Court as the deadline for creditors to file proofs of Claim.

"Beach Street, Units 2 and 5" shall mean the real property owned by the Debtor and generally located at 2 Beach Street, Units 2 and 5, in York, Maine.

"Beach Street, Unit 3" shall mean the real property owned by the Debtor and generally located at 2 Beach Street, Unit 3, in York, Maine.

"BOM" shall mean The Bank of Maine, f/k/a Savings Bank of Maine, and its predecessors and successors in interest.

"BSB" shall mean Bangor Savings Bank, and its predecessors and successors in interest.

"Case" or "Chapter 11 Case" shall mean the Debtor's chapter 11 case.

"Cash" shall mean payment, including by check, issued by or on behalf of the Debtor with respect to any payment of funds required to be made pursuant to the Plan.

"Claim" shall have the meaning set forth in § 101(5) and shall include, without limitation, all rights to payment from the Debtor.

"Claimant" shall mean any individual or entity making or holding a Claim against the Debtor.

"Claims Objection Date" shall mean, with respect to Claims not subject to the Post-Petition Bar Date, the date that is ninety (90) days from the last to occur of: (a) the Bar Date; or (b) with respect to a specified Claim for which a creditor is allowed to file a proof of Claim after the Bar Date, twenty (20) days after the date on which such proof of Claim is filed; or (c) the Confirmation Date. The failure to object to a Claim by the Claims Objection Date shall not constitute a waiver, acceptance or release of any Claim or Post-Confirmation Cause of Action against a creditor, including any Post-Confirmation Cause of Action based on a creditor receiving preferential or fraudulent transfers under §§ 547 or 548.

"Confirmation Date" shall mean the date on which the Bankruptcy Court order confirming the Plan, as the same may be amended, becomes a Final Order.

"Confirmation Hearing" shall mean the hearing held by the Bankruptcy Court to consider confirmation of the Plan, as the same may be amended, and as contemplated by § 1128(a).

"Confirmation Order" shall mean the Final Order entered by the Bankruptcy Court confirming the Plan pursuant to § 1129.

"DDP" shall mean DDP Florida Investments, LLC, and its predecessors and successors in interest.

"Debtor" shall mean LAO Properties, LLC.

"Destefano" shall mean Destefano & Associates, Inc., and its predecessors and successors in interest

"Deutsche Trust" shall mean Deutsche Bank National Trust Company, as Indenture Trustee of the American Home Mortgage Investment Trust 2005-2, and its predecessors and successors in interest.

"Disclosure Statement" shall mean that certain disclosure statement filed by the Debtor in respect of the Plan and approved as containing adequate information pursuant to a Final Order of the Bankruptcy Court.

"Effective Date" shall mean the date that is one hundred twenty (120) days after the Confirmation Date, provided that all the conditions set forth in the Plan have been satisfied.  If an order staying confirmation of the Plan has been entered, the Effective Date shall mean the earlier of the first business day following the date upon which (a) the order confirming the Plan has become a Final Order or (b) any stay of confirmation of the Plan is no longer effective, provided that such business day is more than one hundred twenty (120) days after the Confirmation Date.

"Encumbrances" shall mean all Liens, encumbrances, mortgages, hypothecations, pledges, and security interests of any kind whatsoever.

"Estate" shall mean the bankruptcy estate of the Debtor, as it was created in the Case pursuant to § 541, including as such Estate may be continued or preserved under the Plan.

"Executory Contract" shall mean an executory contract within the meaning of § 365.

"Final Order" shall mean an order of a court of competent jurisdiction with respect to which all periods for taking appeal from such order or any order of an appellate court relating to such order have expired with no appeal pending and no stay of such order being then in effect.

"First Horizon" shall mean First Horizon Home Loan Corporation, and its predecessors and successors in interest.

"Holder" shall mean a creditor holding, including by assignment, a Claim against the Estate.

"Lien" shall mean any mortgage, lien, Claim, interest, encumbrance, security interest, restriction, charge or assessment, of every kind, nature and description, against, in or upon Assets, whether recorded or unrecorded, fixed or contingent, perfected or unperfected, possessory or non-possessory, known or unknown, and, without limiting the foregoing, shall include the meaning set forth in § 101(37).

"MERS-Nation One" shall mean Mortgage Electronic Registration Systems, acting solely as nominee for Nation One Mortgage Company, Inc., and its predecessors and successors in interest.

"Nuzzo" shall mean Steve Nuzzo, and his predecessors and successors in interest.

"Old School" shall mean Old School Financial, Inc., and its predecessors and successors in interest.

"One West" shall mean One West Bank, FSB, and its predecessors and successors in interest.

"Optima" shall mean Optima Bank & Trust Company, and its predecessors and successors in interest.

"Petition Date" shall mean November 1, 2011.

"Plan" shall mean the Debtor's Plan of Reorganization Dated March 2, 2012, as it may be amended or modified by the Debtor from time to time, together with all exhibits, schedules and other attachments thereto, as the same maybe amended or modified by the Debtor from time to time, all of which are incorporated herein by reference.

"Post-Confirmation Causes of Action" shall mean: (a) any and all causes of action belonging to the Debtor or the Estate, whether arising before or after the Petition Date and whether arising under state or federal law, constituting causes of action under §§ 544 to 553 (including any state fraudulent conveyance statute by virtue of § 544); (b) any other causes of action of the Debtor; and (c) any and all proceeds, whether in the form of cash or otherwise, from any recoveries on or settlements of such causes of action.

"Post-Petition Bar Date" shall mean the date which is sixty (60) days following the Confirmation Date.

"Powder Mill" shall mean Powder Mill Road Property Management, LLC, and its predecessors and successors in interest.

"Priority Claim" means an Allowed Unsecured Claim, other than an Administrative Claim, granted a priority under § 507.

"Pro Rata" means proportionate, so that, for example, the ratio of the consideration distributed on account of an Allowed Claim to the amount of the Allowed Claim is the same as the ratio of the consideration distributed on account of all Allowed Claims in such class of Claims to the amount of all Allowed Claims in the class.

"Professional Fees and Expenses" shall mean Allowed Administrative Claims of the professionals hired by the Debtor.

"Provident" shall mean Provident Funding Associates, LP, and its predecessors and successors in interest.

"Real Property" shall mean all of the real property owned by the Debtor (i.e., 31 Ocean Avenue, 67 Ocean Avenue, 80 Ocean Avenue, 83 Ocean Avenue, 3 Ravine Avenue, 35 York Street, 48 Broadway, 9 Kendall Road, Beach Street, Units 2 and 5, and Beach Street, Unit 3).

"RBS" shall mean Mary K. Rivers, d/b/a Rivers by the Sea.

"Secured Claim" shall mean a Claim secured by a valid Lien on property of the Debtor which is not void or avoidable under any state or federal law, including any provision of the Bankruptcy Code.

"Sewer District" shall mean the York Sewer District in York, Maine.

"Substantial Consummation" shall have the meaning assigned to such term in § 1101(2).

"TD Bank" shall mean TD Bank, N.A., f/d/b/a People's Heritage Bank, N.A., and its predecessors and successors in interest

"Unclassified Claims" shall have the meaning assigned to such term in Article II of the Plan.

"Unsecured Claim" shall mean a Claim that is: (a) not an Unclassified Claim; and (b) not secured by a valid Lien on property of the Debtor which is not void or avoidable under any state or federal law, including any provision of the Bankruptcy Code and shall include deficiency Claims related to Secured Claims.

"UST Fees" shall mean the quarterly fees paid and payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6).

"York" shall mean the Town of York, Maine.

### ARTICLE II
### Classification of Claims and Interests

Each Holder of (a) a Claim against the Debtor of whatever nature, whether or not

24

scheduled and whether unliquidated, absolute or contingent, including all Claims arising from

the rejection of leases and executory contracts, or (b) any equity interests in the Debtor, shall be

bound by the provisions of the Plan, and all such Claims and interests are hereby classified as

follows:

**Unclassified Claims** shall consist of: (a) all Administrative Claims, including, without limitation, Professional Fees and Expenses; (b) Priority Claims; and (c) UST Fees.

**Class One** shall consist of the Allowed Secured Claims held by Old School against the Debtor or against any Assets of the Debtor.

**Class Two** shall consist of the Allowed Secured Claims held by the 2006 BONY Trust against the Debtor or against any Assets of the Debtor.

**Class Three** shall consist of the Allowed Secured Claims held by Powder Mill against the Debtor or any Assets of the Debtor.

**Class Four** shall consist of the Allowed Secured Claims held by the 2005 BONY Trust against the Debtor or any Assets of the Debtor.

**Class Five** shall consist of the Allowed Secured Claims held by One West against the Debtor or any Assets of the Debtor.

**Class Six** shall consist of the Allowed Secured Claims held by Provident against the Debtor or any Assets of the Debtor.

**Class Seven** shall consist of the Allowed Secured Claims held by TD Bank against the Debtor or any Assets of the Debtor.

**Class Eight** shall consist of all Allowed Secured Claims held by the 2007 BONY Trust against the Debtor or any Assets of the Debtor.

**Class Nine** shall consist of all Allowed Secured Claims held by Optima against the Debtor or any Assets of the Debtor.

**Class Ten** shall consist of all Allowed Secured Claims held by DDP against the Debtor or any Assets of the Debtor.

**Class Eleven** shall consist of all Allowed Secured Claims held by First Horizon against the Debtor or any Assets of the Debtor.

**Class Twelve** shall consist of all Allowed Secured Claims held by MERS-Nation One against the Debtor or any Assets of the Debtor.

**Class Thirteen** shall consist of all Allowed Secured Claims held by BSB against the Debtor or any Assets of the Debtor.

**Class Fourteen** shall consist of all Allowed Secured Claims held by the Deutsche Trust against the Debtor or any Assets of the Debtor.

**Class Fifteen** shall consist of all Allowed Secured Claims held by BOM against the Debtor or any Assets of the Debtor.

**Class Sixteen** shall consist of all Allowed Secured Claims held by Nuzzo against the Debtor or any Assets of the Debtor.

**Class Seventeen** shall consist of all Allowed Secured Claims held by Destefano against the Debtor or any Assets of the Debtor.

**Class Eighteen** shall consist of any and all Allowed Claims of the Sewer District, including both Allowed Secured Claims and Allowed Unsecured Claims, arising out of or relating to sewer assessments owed by the Debtor in relation to the Real Property.

**Class Nineteen** shall consist of any and all Allowed Claims of York, including both Allowed Secured Claims and Allowed Unsecured Claims, arising out of or relating to real or personal property taxes owed by the Debtor in relation to the Real Property.

**Class Twenty** shall consist of all Allowed Unsecured Claims against the Debtor (unless separately classified).

**Class Twenty-One** shall consist of the equity interests of Lorri O'Brien, Paul O'Brien, and AKR in the Debtor.

### ARTICLE III
### Treatment of the Claims and Interests

A.    **Unclassified Claims**

**Unclassified Claims**.    Unclassified Claims against the Debtor are unimpaired.   All Administrative Claims, including Professional Fees and Expenses and UST Fees, shall be paid in full, unless payment terms are subject to a separate Order of the Bankruptcy Court, on the later of: (a) the Effective Date; (b) the date on which each such Claim becomes an Allowed Claim; or (c) in accordance with such terms as may be agreed upon by the Debtor and each such Holder of an Administrative Claim.   All UST Fees will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code.   Any UST Fees owed on or before the Effective Date will be paid on the Effective Date.

All Priority Claims, other than Claims under § 507(a)(8), shall be paid (a) in accordance

26

with the terms of the Bankruptcy Code, or (b) in accordance with such terms as may be agreed upon by the Debtor and each Holder of such Priority Claim.

All Claims under § 507(a)(8) shall be paid (a) in accordance with the terms of § 1129(a)(9)(C), meaning such Allowed Claims shall be paid monthly payments equal to the total value of such Allowed Claims amortized over the period from the Effective Date to the date which is the fifth (5th) anniversary of the Petition Date with such Allowed Claims accruing interest at the rate of seven percent (7%) with interest starting to accrue on the later of the Effective Date or the date that the amount of the Allowed Claim has been finally determined by agreement of the Debtor and the Holder of such Claim or through a Final Order of the Bankruptcy Court and with the first (1st) payment being made on the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Claim has been finally determined by agreement of the Debtor and the Holder of such Claim or through a Final Order of the Bankruptcy Court and with each successive payment being made on the tenth (10th) day of each successive month and with the last payment being made for the remaining balance on the fifth (5th) anniversary of the Petition Date; or (b) in accordance with such terms as may be agreed upon by the Debtor and each such Holder of a Claim under § 507(a)(8).

**B.**    **Classified Claims**

The treatment of Allowed Claims under the Plan will be as follows:

**Class One**.   The Class One Claims are impaired.   In full and final satisfaction of these Claims, the Debtor and Old School shall perform in accordance with the terms of that certain Order Granting Old School Financial, Inc.'s Motion for Relief from Stay dated January 27, 2012 (the "Old School Order").    Except as provided for by the terms of the Old School Order in relation to the Claims of Old School, for purposes of the Plan and for the purpose of making payments under the Plan, 31 Ocean Avenue shall have a fair market value of **$653,000.00**.

**Class Two**.   The Class Two Claims are impaired.   In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of the 2006 BONY Trust amortized over forty (40) years at an interest rate of four and one-quarter percent (4.25%) with a balloon payment for the remaining amount owed in relation to the Class Two Claim to be made with the one hundred twentieth (120th) payment under the Plan.   The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the 2006 BONY Trust or through a Final Order of the Bankruptcy Court.   Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the 2006 BONY Trust or through a Final Order of the Bankruptcy Court.   Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made

27

until the balloon payment is made with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 67 Ocean Avenue shall have a fair market value of **$915,000.00**.  In the event the Debtor and the 2006 BONY Trust agree or the Court determines that some or all of the Claims of the 2006 BONY Trust constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Three**.  The Class Three Claims are impaired.  In full and final satisfaction of these Claims, the Debtor and Powder Mill shall perform in accordance with the terms of that certain Order Granting Powder Mill Road Property Management, LLC's Motion for Relief from Stay dated January 27, 2012 (the "Powder Mill Order").   Except as provided for by the terms of the Powder Mill Order in relation to the Claims of Powder Mill, for purposes of the Plan and for the purpose of making payments under the Plan, 80 Ocean Avenue shall have a fair market value of **$963,000.00**.

**Class Four**.  The Class Four Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of the 2005 BONY Trust amortized over forty (40) years at an interest rate of four and one-quarter percent (4.25%) with a balloon payment for the remaining amount owed in relation to the Class Four Claims to be made with the one hundred twentieth (120th) payment under the Plan.  The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the 2005 BONY Trust or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the 2005 BONY Trust or through a Final Order of the Bankruptcy Court.  Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 83 Ocean shall have a fair market value of **$736,000.00**.  In the event the Debtor and the 2005 BONY Trust agree or the Court determines that some or all of the Claims of the 2005 BONY Trust constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Five**.  The Class Five Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of One West amortized over forty (40) years at an interest rate of four and one-quarter percent (4.25%) with a balloon payment for the remaining amount owed in relation to the Class Five Claims to be made with the one hundred twentieth (120th) payment under the Plan.  The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured

Claim has been finally determined by agreement of the Debtor and One West or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and One West or through a Final Order of the Bankruptcy Court.  Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 3 Ravine Avenue shall have a fair market value of **$363,000.00**.  In the event the Debtor and One West agree or the Court determines that some or all of the Claims of One West constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Six**.  The Class Six Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of Provident amortized over forty (40) years at an interest rate of four and one-quarter percent (4.25%) with a balloon payment for the remaining amount owed in relation to the Class Six Claims to be made with the one hundred twentieth (120th) payment under the Plan.  The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and Provident or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and Provident or through a Final Order of the Bankruptcy Court.  Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 48 Broadway shall have a fair market value of **$293,000.00**.  In the event the Debtor and Provident agree or the Court determines that some or all of the Claims of Provident constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Seven**.  The Class Seven Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of TD Bank amortized over forty (40) years at an interest rate of four and one-quarter percent (4.25%) with a balloon payment for the remaining amount owed in relation to the Class Seven Claims to be made with the one hundred twentieth (120th) payment under the Plan.  The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and TD  Bank or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the

Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and TD Bank or through a Final Order of the Bankruptcy Court.  Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 35 York Street shall have a fair market value of **$487,000.00**.  In the event the Debtor and TD Bank agree or the Court determines that some or all of the Claims of TD Bank constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Eight**.  The Class Eight Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of the 2007 BONY Trust amortized over forty (40) years at an interest rate of three and four-tenths percent (3.4%) with a balloon payment for the remaining amount owed in relation to Class Eight Claims to be made with the one hundred twentieth (120th) payment under the Plan.  The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the 2007 BONY Trust or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the 2007 BONY Trust or through a Final Order of the Bankruptcy Court.  Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 9 Kendall Road shall have a fair market value of **$438,000.00**.  In the event the Debtor and the 2007 BONY Trust agree or the Court determines that some or all of the Claims of the 2007 BONY Trust constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Nine**.  The Class Nine Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of Optima amortized over forty (40) years at an interest rate of four and one-quarter percent (4.25%) with a balloon payment for the remaining amount owed in relation to the Class Nine Claims to be made with the one hundred twentieth (120th) payment under the Plan.  The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and Optima or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and Optima or through a Final Order of the

Bankruptcy Court. Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment. Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date. For purposes of the Plan and for the purpose of making payments under the Plan, the fair market value of Beach Street, Units 2 and 5 shall be **$160,000.00,** and the fair market value of Beach Street, Unit 3 shall be **$80,000.00**. In the event the Debtor and Optima agree or the Court determines that some or all of the Claims of Optima constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Ten**. The Ten Claims are impaired. In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of DDP amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to the Class Ten Claims to be made with the one hundred twentieth (120th) payment under the Plan. The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and DDP or through a Final Order of the Bankruptcy Court. Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and DDP or through a Final Order of the Bankruptcy Court. Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment. Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date. For purposes of the Plan and for the purpose of making payments under the Plan, 31 Ocean Avenue shall have a fair market value of **$653,00.00**, 67 Ocean Avenue shall have a fair market value of **$915,000.00**, and 9 Kendall Road shall have a fair market value of **$438,000.00**. In the event the Debtor and DDP agree or the Court determines that some or all of the Claims of DDP constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Eleven**. The Class Eleven Claims are impaired. In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of First Horizon amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to Class Eleven Claims to be made with the one hundred twentieth (120th) payment under the Plan. The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and First Horizon or through a Final Order of the Bankruptcy Court. Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and First Horizon or through a Final Order of the Bankruptcy

Court. Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment. Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date. For purposes of the Plan and for the purpose of making payments under the Plan, 83 Ocean Avenue shall have a fair market value of **$736,000.00**. In the event the Debtor and First Horizon agree or the Court determines that some or all of the Claims of First Horizon constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Twelve**. The Class Twelve Claims are impaired. In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of MERS-Nation One amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to the Class Twelve Claims to be made with the one hundred twentieth (120th) payment under the Plan. The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and MERS-Nation One or through a Final Order of the Bankruptcy Court. Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and MERS-Nation One or through a Final Order of the Bankruptcy Court. Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment. Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date. For purposes of the Plan and for the purpose of making payments under the Plan, 3 Ravine Avenue shall have a fair market value of **$363,000.00**. In the event the Debtor and MERS-Nation One agree or the Court determines that some or all of the Claims of MERS-Nation One constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Thirteen**. The Class Thirteen Claims are impaired. In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of BSB amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to the Class Thirteen Claims to be made with the one hundred twentieth (120th) payment under the Plan. The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and BSB or through a Final Order of the Bankruptcy Court. Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and BSB or through a Final Order of the Bankruptcy Court. Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made

32

with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 31 Ocean Avenue shall have a fair market value of **$653,000.00**, 67 Ocean Avenue shall have a fair market value of **$915,000.00**, 80 Ocean Avenue shall have a fair market value of **$963,000.00**, 83 Ocean Avenue shall have a fair market value of **$736,000.00**, 3 Ravine Avenue shall have a fair market value of **$363,000.00**, 35 York Street shall have a fair market value of **$487,000.00**, , 48 Broadway shall have a fair market value of **$293,000.00**, and Beach Street, Unit 3 shall have a fair market value of **$80,000.00**.  In the event the Debtor and BSB agree or the Court determines that some or all of the Claims of BSB constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Fourteen**.  The Class Fourteen Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of the Deutsche Trust amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to the Class Fourteen Claims to be made with the one hundred twentieth (120th) payment under the Plan.  The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the Deutsche Trust or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and the Deutsche Trust or through a Final Order of the Bankruptcy Court.  Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment.  Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making payments under the Plan, 35 York Street shall have a fair market value of **$487,000.00**.  In the event the Debtor and the Deutsche Trust agree or the Court determines that some or all of the Claims of the Deutsche Trust constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Fifteen**.  The Class Fifteen Claims are impaired.  In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of BOM amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to the Class Sixteen Claims to be made with the one hundred twentieth (120th) payment under the Plan. The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and BOM or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by

33

agreement of the Debtor and BOM or through a Final Order of the Bankruptcy Court. Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment. Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date. For purposes of the Plan and for the purpose of making payments under the Plan, 31 Ocean Avenue shall have a fair market value of **$653,000.00**, 67 Ocean Avenue shall have a fair market value of **$915,000.00**, 80 Ocean Avenue shall have a fair market value of **$963,000.00**, 83 Ocean Avenue shall have a fair market value of **$736,000.00**, 3 Ravine Avenue shall have a fair market value of **$363,000.00**, 35 York Street shall have a fair market value of **$487,000.00**, , 48 Broadway shall have a fair market value of **$293,000.00**, and Beach Street, Unit 3 shall have a fair market value of **$80,000.00**. In the event the Debtor and BOM agree or the Court determines that some or all of the Claims of BOM constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Sixteen**. The Class Sixteen Claims are impaired. In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of Nuzzo amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to the Class Sixteen Claims to be made with the one hundred twentieth (120th) payment under the Plan. The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and Nuzzo or through a Final Order of the Bankruptcy Court. Interest shall start to accrue on the later of the Effective Date or the date that the amount of the Allowed Secured Claim has been finally determined by agreement of the Debtor and Nuzzo or through a Final Order of the Bankruptcy Court. Each successive monthly payment shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment. Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date. For purposes of the Plan and for the purpose of making payments under the Plan, 83 Ocean Avenue shall have a fair market value of **$736,000.00**. In the event the Debtor and Nuzzo agree or the Court determines that some or all of the Claims of Nuzzo constitute Allowed Unsecured Claims, such claims shall constitute Class Twenty Claims.

**Class Seventeen**. The Class Seventeen Claims are impaired. In full and final satisfaction of these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed Secured Claim of Destefano amortized over thirty (30) years at an interest rate of five percent (5%) with a balloon payment for the remaining amount owed in relation to the Class Seventeen Claims to be made with the one hundred twentieth (120th) payment under the Plan. The first monthly payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st) month following the Effective Date or the tenth (10th) day of the first (1st) month following the date that the amount of the Allowed Secured Claim has been

34

finally determined by agreement of the Debtor and Destefano or through a Final Order of
the Bankruptcy Court.  Interest shall start to accrue on the later of the Effective Date or the
date that the amount of the Allowed Secured Claim has been finally determined by
agreement of the Debtor and Destefano or through a Final Order of the Bankruptcy Court.
Each successive monthly payment shall be made on the tenth (10th) day of each successive
month after the month the first (1st) payment is made until the balloon payment is made
with the one hundred twentieth (120th) payment.  Any property which secures the Allowed
Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured
Claim after the Confirmation Date.  For purposes of the Plan and for the purpose of making
payments under the Plan, Beach Street, Units 2 and 5 shall have a fair market value of
**$160,000.00**, and Beach Street, Unit 3 shall have a fair market value of **$80,000.00**.  In the
event the Debtor and Destefano agree or the Court determines that some or all of the
Claims of Destefano constitute Allowed Unsecured Claims, such claims shall constitute
Class Twenty Claims.

**Class Eighteen**.  The Class Eighteen Claims are impaired.  In full and final satisfaction of
these Claims, the Debtor shall make monthly payments equal to the amount of the Allowed
Claims of the Sewer District amortized over five (5) years at an interest rate of four and
one-quarter percent (4.25%).  The first monthly payment under the Plan shall be made on
the later of the tenth (10th) day of the first (1st) month following the Effective Date or the
tenth (10th) day of the first (1st) month following the date that the amount of the Allowed
Secured Claim has been finally determined by agreement of the Debtor and the Sewer
District or through a Final Order of the Bankruptcy Court.  Interest shall start to accrue on
the later of the Effective Date or the date that the amount of the Allowed Secured Claim
has been finally determined by agreement of the Debtor and the Sewer District or through a
Final Order of the Bankruptcy Court.  Each successive monthly payment shall be made on
the tenth (10th) day of each successive month after the month the first (1st) payment is made
until the balloon payment is made with the one hundred twentieth (120th) payment.  Any
property which secures the Allowed Secured Claim as of the Confirmation Date shall
continue to secure the Allowed Secured Claim after the Confirmation Date.  The Sewer
District shall return any security deposits made by the Debtor pursuant to § 366 on the
Confirmation Date.

**Class Nineteen**.  The Class Nineteen Claims are impaired.  In full and final satisfaction of
these Claims, the Debtor shall pay such Allowed Claims in accordance with the terms of §
1129(a)(9)(D).  The Debtor shall make monthly payments to York equal to the total value
of such Allowed Claims amortized over the period from the Effective Date to the date
which is the fifth (5th) anniversary of the Petition Date, with such Allowed Claims accruing
interest at the rate of seven percent (7%, pursuant to 36 M.R.S. § 505).  The first monthly
payment under the Plan shall be made on the later of the tenth (10th) day of the first (1st)
month following the Effective Date or the tenth (10th) day of the first (1st) month following
the date that the amount of the Allowed Secured Claim has been finally determined by
agreement of the Debtor and York or through a Final Order of the Bankruptcy Court.
Interest shall start to accrue on the later of the Effective Date or the date that the amount of
the Allowed Secured Claim has been finally determined by agreement of the Debtor and
York or through a Final Order of the Bankruptcy Court.  Each successive monthly payment

shall be made on the tenth (10th) day of each successive month after the month the first (1st) payment is made until the balloon payment is made with the one hundred twentieth (120th) payment. Any property which secures the Allowed Secured Claim as of the Confirmation Date shall continue to secure the Allowed Secured Claim after the Confirmation Date.

**Class Twenty**. The Class Twenty Claims are impaired. In full and final satisfaction of these Claims, each Claimant shall receive a <u>Pro Rata</u> distribution of the Annual Net Operating Revenue, with the first (1st) distribution being made on or before the first January 31 occurring after the Effective Date. Annual payments shall be made as provided for herein for a period of seven (7) years. Any utility holding an adequate assurance deposit shall return the deposit to the Debtor on the Confirmation Date.

**Class Twenty-One**. The interests in Class Twenty-One are impaired. The Holders of interests in Class Twenty-Three – Lorri O'Brien, Paul O'Brien, and AKR – shall retain their current equity interests in the Debtor, but there shall be no distributions with respect to such interests until the Claims in Class Twenty are paid in full in accordance with the terms of the Plan, and provided that the Debtor is not in default of its obligations to the Claimants in Classes One through Nineteen.

## ARTICLE IV
### Interests to be Retained and Rights to be Exercised by the Debtor

<u>Preservation of All Post-Confirmation Causes of Action</u>. Except as otherwise provided in the Plan, or in any contract, instrument, release or agreement entered into in connection with the Plan, in accordance with § 1123(b), the Debtor and the Estate retain and preserve and shall be vested with, retain, and may enforce and prosecute any Claims or Post-Confirmation Causes of Action that the Debtor or the Estate may have against any person or entity that constitute Post-Confirmation Causes of Action. The Debtor shall have standing as a representative of the Estate for the purposes of investigating, pursuing, prosecuting, settling, collecting, liquidating, and/or recovering any assets, Claims or causes of action that constitute Post-Confirmation Causes of Action.

## ARTICLE V
### Provisions Affecting All Creditors; Means of Execution of the Plan

<u>Financing of the Plan Obligations</u>. The payments required under the Plan shall be made primarily from the following sources: (a) the proceeds generated from the operation of the Real

36

Property; and (b) proceeds of any Post-Confirmation Causes of Action and Claims which the Debtor and/or the Estate have brought and/or may elect to bring, including without limitation, any proceeds of such Post-Confirmation Causes of Action.  In the event the Debtor sells or refinances all of the Real Property, the proceeds from such sale or refinancing (after accounting for the costs and expenses associated with the sale) shall be distributed in accordance with the treatment of Claims under the Plan in full and final satisfaction of the Debtor's obligations under the Plan.  In the event the Debtor sells or refinances less than all of the Real Property, the proceeds (after accounting for the costs and expenses associated with the sale) shall first be used to satisfy the Allowed Secured Claims secured by that specific property which is the subject of the sale or refinancing.  The remaining proceeds, if any, shall be used to fund Unclassified Claims first, then Allowed Claims in Class Twenty, with the remaining amounts, if any, being distributed to Claimants in Class Twenty-One.

Manner of Distribution.  Any distributions under the Plan may be made either in Cash, by check drawn on a domestic bank or by wire transfer (or by any manner agreed to between the Debtor and the Holder of an Allowed Claim) and shall be made in United States Funds. Notwithstanding any other provisions of the Plan to the contrary, no payment of fractional cents will be made under the Plan.  Cash will be issued to Holders entitled to receive a distribution of Cash in whole cents (rounded to the nearest whole cent when and as necessary).

De Minimis Distributions.  "De Minimus Distributions" shall refer to any distribution of less than Twenty Dollars (**$20.00**).  All De Minimis Distributions will be held by the Debtor for the benefit of the Holders of Allowed Claims entitled to De Minimis Distributions.  When the aggregate amount of De Minimis Distributions exceeds Fifty Dollars (**$50.00**), the Debtor will distribute such De Minimis Distributions to such Holder of the Allowed Claim.  If, at the time

that the final distribution under the Plan is to be made, the De Minimis Distributions total less than Fifty Dollars (**$50.00**), such funds shall not be distributed to such Holder of the Allowed Claim, but rather, shall vest in the Estate and be distributed to other Holders of Allowed Claims in accordance with the terms of the Plan.

Delivery of Distributions.  Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be made by the Debtor: (i) at the addresses set forth on the proofs of Claim filed by such Holders (or at the last known addresses of such Holder if no motion requesting payment or proof of Claim is filed or the Debtor has been notified in writing of a change of address); (ii) at the addresses set forth in any written notices of address changes delivered to the Debtor after the date of any related proof of Claim; or (iii) at the addresses reflected in the schedules filed by the Debtor if no proof of Claim has been filed and the Debtor has not received a written notice of a change of address.

Undeliverable Distributions.  If payment or distribution to any Holder of an Allowed Claim under the Plan is returned for lack of a current address for the Holder or otherwise, the Debtor shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment.  If, after the passage of ninety (90) days, the payment or distribution still cannot be made, the payment or distribution and any further payment or distribution to the Holder shall be distributed to the Holders in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied to the same extent as if payment or distribution had been made to the Holder of the Allowed Claim.

Time Bar to Cash Payments.  Checks issued by the Debtor in respect of distributions to Holders of Allowed Claims pursuant to this Plan will be null and void if not cashed within one hundred twenty (120) days of the date of their issuance.  Requests for reissuance of any check

shall be made to the Debtor by the Holder of the Allowed Claim with respect to which the check originally was issued.  Any Claim in respect of such a voided check must be made on or before six (6) months after the date of issuance of the check.  After that date, all Claims in respect of void checks will be discharged and forever barred and the Cash, including interest earned thereon, if any, shall be treated as an additional recovery of proceeds for distribution as of the date of expiration of said six (6) month period and thereafter shall be held and distributed in accordance with the terms of the Plan.

Plan Defaults.  In the event any party claims that the Debtor is in default of any obligation of the Debtor under the terms of the Plan, including any claim that the Debtor failed to make any payment required by the terms of the Plan, such party shall provide the Debtor with written notice setting forth, in specific terms, the alleged default.  The Debtor shall have fifteen (15) business days to respond or cure the default.  In the event the Debtor fails to respond or cure the default within the fifteen (15) business day period, the party claiming the default shall be free to exercise its rights and remedies against the Debtor under the Plan.

Setoffs and Recoupments.  The Debtor may, pursuant to §§ 502(h), 553, and 558, or applicable non-bankruptcy law, but shall not be required to, offset against or recoup from any Claim on which payments are to be made pursuant to the Plan, any Claims or Post-Confirmation Causes of Action of any nature whatsoever that are proven valid that the Debtor may have against the Holder of such Claim; provided, however, that neither the failure to effect such offset or recoupment nor the allowance of any Claim shall constitute a waiver or release by the Debtor or the Estate of any right of offset or recoupment that the Debtor or the Estate may have against the Holder of such Claim, nor of any other Claim or Post-Confirmation Cause of Action.

Distributions in Satisfaction; Allocation.  Except for the obligations expressly imposed by the Plan and the property and rights expressly retained under the Plan, if any, the distributions and rights that are provided in the Plan shall be in complete satisfaction and release of all Claims against, liabilities in, Liens on, obligations of and interests in the Debtor and the Estate and the Assets of the Debtor and the Estate, whether known or unknown, arising or existing prior to the Effective Date.

Cancellation of Notes and Instruments.  As of the Effective Date, except to the extent otherwise provided in the Plan, all notes, agreements and securities evidencing Claims and interests and the rights thereunder of the Holders thereof shall, with respect to the Debtor, be canceled and deemed null and void and of no further force and effect, and the Holders thereof shall have no rights against the Debtor or the Estate, and such instruments shall evidence no such rights, except the right to receive the distributions provided for in the Plan.

No Interest on Claims.  Unless otherwise specifically provided for in the Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtor and a Holder of a Claim and approved by an order of the Bankruptcy Court, post-petition interest shall not accrue or be paid on any Claim, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  In addition, and without limiting the foregoing, interest shall not accrue on or be paid on any Claim which is not an Allowed Claim (a "Disputed Claim") with respect to the period from the Confirmation Date to the date the first distribution is made when and if such Disputed Claim becomes an Allowed Claim.  No payments shall be made to the holder of a Disputed Claim until such time as the Disputed Claim becomes an Allowed Claim at which time the Debtor shall begin to make payments to the Holder of the Allowed Claim from

40

the date the Disputed Claim is deemed an Allowed Claim in accordance with the terms of the

Plan.

Cram Down.    In the event that any class allowed to vote is deemed impaired under the

Plan and refuses to accept the terms of the Plan, the Debtor shall move the Bankruptcy Court to

confirm the Plan pursuant to § 1129(b).  All Claims of creditors and the rights of all holders of

equity interests in the Debtor shall be satisfied solely in accordance with the Plan.

## ARTICLE VI
## Claims and Interests

Pre-petition Claims and Amendments.  Each Claim as to which a proof of Claim is

required to be filed on or before the Bar Date and as to which a proof of Claim was not filed on

or before the Bar Date shall not become an Allowed Claim absent the Debtor's consent.  In no

event shall the Allowed Amount of any Claim against the Debtor exceed the amount set forth in

a proof of Claim therefore filed on or before the Bar Date unless the Claimant in its proof of

Claim expressly reserved the right to amend such proof of Claim in which case any such

amended proof of Claim must be filed by the Confirmation Date.   No order allowing or

disallowing a Claim may be reconsidered, pursuant to § 502(j) or otherwise, so as to increase the

Allowed Amount thereof after entry of the Confirmation Order.

Objections to Claims and Interests.  Any and all Claims and interests, other than Post-

Petition Claims, which have not been scheduled by the Debtor as contingent, unliquidated, or

disputed, or as to which a valid proof of Claim or interest has been filed on or before the Bar

Date, shall be allowed in full, unless an objection to such Claim or interest is filed on or before

the Claims Objection Date.  Claims that have been objected to and not allowed shall have no

right to vote with respect to the acceptance or rejection of this Plan, except as otherwise ordered

by the Bankruptcy Court.

41

Bar Date for Objection to Post-Petition Claims. Any Claim entitled to priority under §

507(a)(2), arising before the Confirmation Date and still outstanding sixty (60) days thereafter,

shall be forever barred unless it is the subject of a proof of Claim (or, in the case of a Claim for

Professional Fees and Expenses, an application for compensation) filed with the Bankruptcy

Court on or before the Post-Petition Bar Date. Any Claim that is the subject of such proof of

Claim (or application for compensation) shall be Allowed in full unless an objection thereto is

filed within thirty (30) days after the Post-Petition Bar Date or such other date as is provided by

order upon motion of the Debtor, except that Claims for Professional Fees and Expenses shall be

Allowed only by order of the Bankruptcy Court.

## ARTICLE VII
## Executory Contracts and Unexpired Leases

Under the Plan, unless an executory contract or unexpired lease is specifically assumed

under the Plan, or is the subject of a motion to assume the contract or lease and the motion is

pending as of the Confirmation Date or is otherwise dealt with by an order of the Bankruptcy

Court entered on or prior to the Confirmation Date, any and all executory contracts and

unexpired leases of the Debtor shall be deemed rejected as of the Confirmation Date, if not

earlier rejected by other orders of the Bankruptcy Court. The non-Debtor party to any such

rejected contract or lease shall be required to assert a Claim for damages from such rejection in

accordance with Article VII, § 7.2 of the Plan.

## VIII.    Governance and Maintenance

Upon confirmation of the Plan, Lorri O'Brien, as the manager of the Debtor under the

terms of the Debtor's operating agreement, shall continue operate the Assets of the Debtor on a

day to day basis, which management may involve the assistance of an outside property

management company.  Lorri O'Brien, Paul O'Brien, and AKR will remain the members of the Debtor.

### IX.    Injunction and Stay

Under the Plan, the entry of the Confirmation Order will constitute an injunction applicable to all persons, staying and enjoining the enforcement or attempted enforcement by any means of all Liens, Claims and debts: (A) discharged pursuant to the Plan; and/or (B) not discharged but relating to the Debtor or the Assets of the Debtor.

### X.    Feasibility of the Plan

Under the Bankruptcy Code, in order to confirm the Plan, the Debtor must demonstrate that the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, unless such liquidation or reorganization is proposed in the Plan. In other words, the Debtor must demonstrate that the Plan is "feasible."

The Plan is feasible because the Debtor – through the Plan and otherwise – has reorganized its affairs to reduce its expenses and enhance its revenues.  The Debtor has reduced its expenses in a number of ways.   First, prior to the Petition Date, the Debtor owed approximately $10 million in secured debt, and the revenues generated by the Real Property were insufficient to pay debt service expenses.  Under the Plan, the Debtor's secured debt would be reduced to approximately $5 million.  Additionally,,  the Debtor has reached an agreement with Mirabito , pursuant to which the Debtor has turned over two parcels of Real Property to Mirabito – Brickyard Court and Varrell Lane – in exchange for a full release of Mirabito's Claims against the Debtor (approximately $400,000.00).  This agreement benefitted the Debtor and its estate because it reduced the Claims against its estate by turning over two parcels of Real Property whose operating expenses exceed their gross revenues.  Further, since the Petition Date,

through investigation and negotiation, the Debtor has convinced D.D.P., LLC to waive all its Claims against the Debtor (approximately $500,000.00).

Since the Petition Date, the Debtor has also enhanced its revenues.  Prior to the Petition Date, several individuals and entities affiliated with the Debtor and its principal, Lorri O'Brien, occupied some of the Real Property, but did not pay market rent to the Debtor or the Previous Owners.  Since the Petition Date, the Debtor has enhanced its revenues by requiring these individuals and entities to pay fair market rental values.

Based on these reduced expenses and enhanced revenues,  the Debtor's projected revenues now exceed the Debtor's operating expenses (all as reflected on **Exhibit A** hereto). This profit margin – which the Debtor believes will increase year over year as the economy improves – will allow the Debtor to fund its obligations under the Plan.  Additionally, the pay down of the Debtor's indebtedness to creditors over the course of the Plan will allow the Debtor to make any balloon payments which may be required at the expiration of any applicable payment terms under the Plan.  Premised on all of the above, the Plan is not likely to be followed by the liquidation of the Debtor or the need for further financial reorganization.

## XI.     **Risk Factors**

The primary risk factors affecting the amount and timing of the distributions to Holders of Claims are as follows:

1.   Administrative Claims could exceed estimated amounts;

2.   Vacancy rates for the Real Property could increase past historic levels, thereby causing Annual Net Operating Revenue to drop;

3.   Some or all of the Real Property could need extraordinary repair or maintenance and/or the operating expenses could increase over the amounts set forth on **Exhibit A** attached hereto.

One or all of these factors could lengthen payment times relating to payment of

44

Unsecured Claims.

## XII.    Plan Alternatives and Liquidation Analysis

The alternative to the Plan is the liquidation of the Assets in a proceeding under chapter 7 of the Bankruptcy Code, and the distribution of the net proceeds thereof to secured, priority, and unsecured creditors in the order of priority and manner provided under the Bankruptcy Code.  In general, this would require that secured creditors be paid first, then administrative expense creditors, including administrative expense creditors in the Chapter 11 Case and in the chapter 7 case (with the latter having priority), then priority creditors, with the balance, if any, distributed to unsecured creditors on a Pro Rata basis.

In a chapter 7 case, all of the Assets would be liquidated (or simply turned over to the Secured Creditor holding an interest in the Asset).  Although it is impossible to determine the exact liquidation value of the Assets, the following is an estimate as to the results of a liquidation of the Real Property (the Debtor's primary Assets):

**31 Ocean Avenue**:  This property has a fair market value of approximately $653,000.00.  Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $457,100.00 (which amount excludes the costs and expenses associated with liquidating the property).  Old School asserts a first priority mortgage on 31 Ocean Avenue and is asserting a Claim against the Debtor in the amount of $890,543.83.  Premised on the value of 31 Ocean Avenue, the proceeds of a liquidation would be used entirely to fund obligations owed to Old School (excluding any portion needed to pay priority tax and sewer liens) and even Old School would receive only a portion of its Claim.

**67 Ocean Avenue**: This property has a fair market value of approximately $915,000.00.  Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $640,500.00 (which amount excludes the costs and expenses associated with liquidating the property).  The 2006 BONY Trust asserts a first priority mortgage on 67 Ocean Avenue and is asserting a Claim against the Debtor in the amount of $974,953.99.  Premised on the value of 67 Ocean Avenue, the proceeds of a liquidation would be used entirely to fund obligations owed to the 2006 BONY Trust (excluding any portion needed to pay priority tax and sewer liens) and even the 2006 BONY Trust would receive only a portion of its Claim.

**80 Ocean Avenue**: This property has a fair market value of approximately $963,000.00. Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $741,510.00 (which amount excludes the costs and expenses associated with liquidating the property).  Powder Mill asserts a first priority mortgage on 80 Ocean Avenue and is asserting a Claim against the Debtor in the amount of $1,557,728.34.  Premised on the value of 80 Ocean Avenue, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to Powder Mill (excluding any portion needed to pay priority tax and sewer liens) and even Powder Mill would receive only a portion of its Claim.

**83 Ocean Avenue**: This property has a fair market value of approximately $736,000.00. Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $515,200.00 (which amount excludes the costs and expenses associated with liquidating the property).  The 2005 BONY Trust asserts a first priority mortgage on 83 Ocean Avenue and is asserting a Claim against the Debtor in the amount of $911,978.94.  Premised on the value of 83 Ocean Avenue, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to the 2005 BONY Trust (excluding any portion needed to pay priority tax and sewer liens) and even the 2005 BONY Trust would receive only a portion of its Claim.

**3 Ravine Avenue**: This property has a fair market value of approximately $363,000.00. Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $254,100.00 (which amount excludes the costs and expenses associated with liquidating the property).  One West asserts a first priority mortgage on 3 Ravine Avenue, and is asserting a Claim against the Debtor in the amount of $426,764.11.  Premised on the value of 3 Ravine Avenue, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to One West (excluding any portion needed to pay priority tax and sewer liens) and even One West would receive only a portion of its Claim.

**35 York Street**: This property has a fair market value of approximately $487,000.00. Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $340,900.00 (which amount excludes the costs and expenses associated with liquidating the property).  TD Bank asserts a first priority mortgage on 35 York Street and is asserting a Claim against the Debtor in the approximate amount of $150,000.00.  The Deutsche Trust asserts a second priority mortgage on 35 York Street and is asserting a Claim against the Debtor in the amount of $461,360.74.  Premised on the value of 35 York Street, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to TD Bank (excluding any portion needed to pay priority tax and sewer liens) and the Deutsche Trust would receive proceeds equal to only a percentage of its Claim.

**48 Broadway**: This property has a fair market value of approximately $293,000.00. Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $205,100.00 (which amount excludes

the costs and expenses associated with liquidating the property).  Provident asserts a first priority mortgage on 48 Broadway and is asserting a Claim against the Debtor in the amount of $353,732.26.  Premised on the value of 48 Broadway, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to Provident (excluding any portion needed to pay priority tax and sewer liens) and even Provident would receive only a portion of its Claim.

**9 Kendall Road**: This property has a fair market value of approximately $438,000.00. Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $306,600.00 (which amount excludes the costs and expenses associated with liquidating the property).  The 2007 BONY Trust asserts a first priority mortgage on 9 Kendall Road and is asserting a Claim against the Debtor in the amount of $640,429.04.  Premised on the value of 9 Kendall Road, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to the 2007 BONY Trust (excluding any portion needed to pay priority tax and sewer liens) and even the 2007 BONY Trust would receive only a portion of its Claim.

**Beach Street, Units 2 and 5**: This property has a fair market value of approximately $160,000.00.  Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $112,000.00 (which amount excludes the costs and expenses associated with liquidating the property). Optima asserts a first priority mortgage on Beach Street, Units 2 and 5, and is asserting a Claim against the Debtor in the approximate amount of $155,000.00.  Premised on the value of Beach Street, Units 2 and 5, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to Optima (excluding any portion needed to pay priority tax and sewer liens) and even Optima would receive only a portion of its Claim.

**Beach Street, Unit 3**: This property has a fair market value of approximately $80,000.00. Assuming a liquidation value of seventy percent (70%) of fair market value, at liquation, this property would likely generate approximately $56,000.00 (which amount excludes the costs and expenses associated with liquidating the property).  Optima asserts a first priority mortgage on Beach Street, Unit 3 and is asserting a Claim against the Debtor in the amount of $128,372.00.  Premised on the value of Beach Street, Unit 3, therefore, the proceeds of a liquidation would be used entirely to fund obligations owed to Optima (excluding any portion needed to pay priority tax and sewer liens), and even Optima would receive only a portion of its Claim.

From the above, in the event the Debtor's Real Property was liquidated under chapter 7 of the Bankruptcy Code, there likely would be no proceeds available for distribution other than the payments to parties holding secured Claims against the Real Property.

In the event of a proceeding under chapter 7 of the Bankruptcy Code, the Debtor's three remaining Assets would also be liquidated by a trustee.  First, the Debtor holds an account

receivable owed by RBS in the amount of $367,312.60. As described in § V above, however, the Debtor believes that RBS may hold a right to set off, and thus liquidation of the account receivable would provide no proceeds for distribution to the Debtor's creditors.

Second, the Debtor owns well used household furnishing with a value of approximately $200,000.00. It is likely that a buyer of the Real Estate would purchase the furnishings for little or no additional cost. Assuming that the furnishings were liquidated separately by a trustee, however, they would likely generate proceeds of approximately twenty-five percent (25%) of the current value, or approximately $50,000.00. These proceeds would be available for distribution to the Debtor's creditors in accordance with the Bankruptcy Code's priority distribution scheme, by which these proceeds would first be distributed to Holders of Administrative Claims (including, but not limited to, Professional Fees and Expenses), and then to Holders of general Unsecured Claims. As described more fully in § VII above, the Debtor projects that Administrative Claims will exceed $50,000.00, and thus there would be no proceeds available for distribution to Holders of general Unsecured Claims.

Third, in the event of a chapter 7 case, the trustee may be entitled to attempt to avoid and recover preferential payments made by the Debtor in the ninety (90) days prior to the Petition Date (and payments to insiders made within one (1) year of the Petition Date), as well as transfers of property made by the Debtor with actual fraudulent intent or for less than reasonably equivalent value. At this time, the Debtor is still in the process of investigating potential Post-Confirmation Causes of Action, but based on current information, the Debtor does not anticipate any significant recoveries. Assuming that a trustee could recover some amounts from Post-Confirmation Causes of Action, however, the proceeds would first be distributed to Holders of Administrative Claims (including, but not limited to, Professional Fees and Expenses), and then

48

to the Debtor's general unsecured creditors.  The Debtor anticipates that any proceeds of Post-Confirmation Causes of Action would be insufficient to pay Holders of Administrative Claims in full, let alone provide for payments to the Debtor's general unsecured creditors.

In light of the foregoing analysis, a liquidation of the Debtor's Assets under chapter 7 of the Bankruptcy Code would be unlikely to provide for full payment to Holders of secured and Administrative Claims, and there would likely be no proceeds to distributed to the Holders of general Unsecured Claims.  Under the Plan, however, the Debtor proposes to pay Allowed Secured Claims in full with interest, and the Debtor proposes to pay Allowed Unsecured Claims the Annual Net Operating Revenue for a period of seven (7) years.  For this reason, the Debtor believes that confirmation of the Plan will result in an enhanced return to all creditors, and thus will serve the creditors' best interests, as required by § 1129(a)(7)(A).

## XIII.  <u>Voting to Accept or Reject the Plan</u>

Enclosed with this Disclosure Statement is a ballot for your use in voting to accept or reject the Plan.  The Debtor encourages you to vote to accept the Plan.  In order for your vote to count, and if you are a creditor of the Debtor, your properly completed and executed ballot must be received no later than 5:00 p.m. (Eastern Standard Time) on _____, 2012 at the office of the Debtor's counsel:

> Jeremy R. Fischer, Esq.
> Bernstein, Shur, Sawyer & Nelson P.A.
> 100 Middle Street, PO Box 9729
> Portland, ME 04104-5029

**Submission of ballots by facsimile (fax) is <u>not</u> permitted; submission of ballots by e-mail is <u>not</u> permitted.**

**EACH CREDITOR SHOULD NOTE THAT IF ANY CLASS OF CLAIMS SHOULD FAIL TO ACCEPT THE PLAN BY THE REQUISITE MAJORITY, THE**

**BANKRUPTCY COURT MAY NONETHELESS ENTER AN ORDER CONFIRMING THE PLAN IF, AFTER NOTICE AND A HEARING, THE BANKRUPTCY COURT FINDS THAT THE PLAN DOES NOT DISCRIMINATE UNFAIRLY AND IS FAIR AND EQUITABLE WITH RESPECT TO ANY IMPAIRED CLASS OF CLAIMS OR INTERESTS WHICH HAS NOT ACCEPTED THE PLAN.  IF ANY CLASS OF CLAIMS FAILS TO ACCEPT THE PLAN BY THE REQUISITE MAJORITY, THE DEBTOR SHALL SEEK THIS TREATMENT.**

### XIV.   Confirmation

The Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan.  The Bankruptcy Code also allows any party in interest to object to confirmation.  Any objection to confirmation must be made in writing, filed with the Clerk of the Bankruptcy Court, and served upon all parties who have filed a demand for receipt of papers under Federal Rule of Bankruptcy Procedure 2002, and on Debtor's counsel on or before the date set by the Court. Any party that objects to confirmation must also attend the confirmation hearing, either in person or through counsel.

### XV.   Effect of Confirmation

Confirmation of the Plan shall discharge the Debtor from all Claims arising before the date of Confirmation, except as expressly provided in the Plan.  The Confirmation Order shall permanently enjoin all Holders of Claims from taking action contrary to the Plan or to collect upon any Claim other than pursuant to the Plan.

### XVI.   Income Tax Consequences

The federal, state, and local tax consequences of the Plan may be complex and, in some cases, uncertain.  Such consequences may also vary based upon the individual circumstances of

50

each Holder of a Claim or interest.  **ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES OF THE PLAN.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR, AND SHALL NOT BE DEEMED TO CONSTITUTE, ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN.**  Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any distributions under the Plan.

## XVII.  <u>Retention of Jurisdiction</u>

To the maximum extent permitted by 28 U.S.C. § 1334 and the Bankruptcy Code, the Debtor has requested that the Bankruptcy Court retain jurisdiction with respect to the following matters:

    (a)    To adjudicate all controversies concerning the classification, allowance, or determination of any Claim or interest, including, without limitation, any Administrative Claim or Claim arising from any environmental liability;

    (b)    To hear and determine all Claims arising from rejection of any executory contract or unexpired lease and to consummate the rejection and termination thereof;

    (c)    To liquidate damages in connection with any disputed, contingent or unliquidated Claims;

    (d)    To adjudicate all Claims to, or ownership of any Assets of, the Debtor or in any proceeds thereof arising prior to and after the Effective Date;

    (e)    To adjudicate all Claims and controversies arising out of any purchases, sales or contracts made or undertaken by the Debtor prior to the Effective Date;

    (f)    To make such orders as are necessary and appropriate to construe or effectuate the provisions of the Plan;

    (g)    To hear and determine any and all Post-Confirmation Causes of Action;

    (h)    To hear and determine any and all applications of professional persons for

allowance of compensation and/or reimbursement of Professional Fees and Expenses and all other Administrative Claims which may be pending on, or made after, the Confirmation Date;

(i)     To adjudicate any and all motions, adversary proceedings and litigated matters pending on the Confirmation Date or filed thereafter within any applicable statutory period;

(j)     To adjudicate any and all controversies and disputes arising under, or in connection with, the Plan or any order or document entered or approved by the Bankruptcy Court in connection with the Debtor, the Case, or any controversy or dispute which may affect the Debtor's ability to implement or fund the Plan; and

(k)     To hear and determine such other matters as the Bankruptcy Court in its reasonable discretion shall deem appropriate.

## XVIII. <u>Conclusion</u>

The Debtor submits that the Plan complies in all respects with chapter 11 of the Bankruptcy Code, and recommends to Holders of Claims who are entitled to vote on the Plan that they vote to accept the Plan.  The Debtor reminds such Holders that each ballot, signed and marked to indicate the Holder's vote, must be <u>received</u> by the Debtor's counsel no later than April 13, 2012 at 5:00 p.m. (EST).  Ballots submitted by facsimile or email will not be accepted.

Respectfully submitted,

**LAO PROPERTIES, LLC**

By its attorneys:

DATED: March 2, 2012

/s/   *D. Sam Anderson*
D. Sam Anderson, Esq.
Jeremy R. Fischer, Esq.
BERNSTEIN, SHUR, SAWYER & NELSON, P.A.
100 Middle Street, P.O. Box 9729
Portland, ME 04104-5029
Telephone: (207) 774-1200
sanderson@bernsteinshur.com

52